# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TERRY COLLETT,
Plaintiff,

Case No. 1:17-cv-295
Litkovitz, M.J.

vs.

HAMILTON COUNTY, OHIO, *et al.*,
Defendants.

**ORDER**

Plaintiff Terry Collett brings this action under 42 U.S.C. § 1983 and state law. Plaintiff

alleges defendants Joanne Taylor and Patrick McKown, who were Special Deputy Corporals of

Hamilton County, Ohio at the time (collectively, "Special Deputies"), violated his civil rights when

they handcuffed and transported him to the Hamilton County Justice Center after his arrest on a

charge of operating a vehicle while impaired. Plaintiff also claims that the Special Deputies were

negligent and are not immune from individual liability for their negligence under Ohio law, and

that Hamilton County, Ohio can be held liable for the Special Deputies' negligence to the extent

the individuals are sued in their official capacity.[1] The matter is before the Court on defendants'

motion to dismiss/motion for summary judgment (Doc. 61), plaintiff's response in opposition (Doc.

63), and defendants' reply in support of the motion (Doc. 67).

## I.     Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of

an action. A motion for summary judgment should be granted if the evidence submitted to the

Court demonstrates that there is no genuine issue as to any material fact, and that the movant is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477

---

[1] Plaintiff also sued Hamilton County under § 1983 for failure to train and supervise and for ratification, but he has
opted to not pursue those claims. (Doc. 63 at 17).

U.S. 317, 322 (1986). Under Fed. R. Civ. P. 56(c), a grant of summary judgment is proper if "the depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). In reviewing a motion for summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 255).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Cities Service*, 391 U.S. at 289). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Summary judgment is appropriate when a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23 (1986).

## II. Facts

The following facts are undisputed: Plaintiff is a 65-year old man who suffers from a heart condition and obstructive sleep apnea. He takes the prescription drug Coumadin, which is a blood thinner. At approximately 9:00 p.m. on June 5, 2015, plaintiff was driving his 2004 Toyota Tacoma truck westbound on I-74 in the Greater Cincinnati area. He had consumed 6 to 7 beers over the preceding several hours and was intoxicated. A motorist in a vehicle following plaintiff's truck, Christy Adams, observed plaintiff driving erratically. She called 911 and reported his vehicle was weaving and swerving between lanes, it was speeding, and the truck hit a cement barrier/guardrail and nearly hit three other vehicles as plaintiff reached the I-74/I-275 interchange. Adams continued to follow plaintiff as he exited at Ohio Route 128 and stopped at the Whitewater Township Park & Ride. Hamilton County Deputy Sheriff Doug Partin arrived at the scene and administered field sobriety tests, which plaintiff failed. Partin read plaintiff his rights, placed him under arrest for OVI, handcuffed him, and transported him to District 2, Green Township. Plaintiff voluntarily completed a breathalyzer test, which showed a blood alcohol concentration (BAC) of .144, which exceeded the legal limit. Plaintiff was cited for violations of Ohio Rev. Code § 4511.19(A)(1)(a) (Operation of Motor Vehicle While Intoxicated - "OVI") and § 4511.19(A)(1)(d) (BAC).[2]

Special Deputies Taylor and McKown were assigned to work the prisoner transportation detail for the Hamilton County Sheriff's Office (HCSO) the evening of June 5, 2015. Both Special

---

[2] The statute in effect at the time prohibited a person from operating a vehicle if either of the following applied: "(a) The person is under the influence of alcohol, a drug of abuse, or a combination of them"; or "(d) The person has a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of the person's breath." Ohio Rev. Code § 4511.19(A)(1)(a), (d).

Deputies were trained and commissioned law enforcement officers who provided eight hours of unpaid service per month to the HCSO working the prisoner transportation detail. They picked Collett up at District 2. Special Deputy Taylor reviewed the paperwork for the transport. She testified at her deposition that she carries hinged handcuffs, which she did not use on plaintiff that night. (Doc. 37, PAGEID#:113-14). Special Deputy McKown testified that neither he nor Special Deputy Taylor carry hinged handcuffs. (Doc. 41, PAGEID#: 610). He also initially testified that he used his handcuffs to cuff plaintiff (*Id.*), but he later equivocated and testified that he did not recall whether he or defendant Taylor handcuffed plaintiff and he did not remember whose handcuffs were used. (*Id.* at PAGEID#: 617-20).

After plaintiff was handcuffed, he was placed in the back of the transport van. McKown drove the van and Taylor sat in the passenger seat. A partition separated the cab of the van from the rear passenger compartment. The only seating in the rear compartment was a flat metal bench on the side wall of the van. There were no seatbelts in the rear compartment. Straps were located at intervals along the wall where the bench met the wall. A sign was posted in the passenger compartment that informed passengers to hold on to a strap while the van was in motion. There were no windows in the rear compartment of the van. There was a metal grate in the partition between the front of the van and the rear compartment. Plaintiff had a limited view of the road ahead through the grate, which was partially obstructed by Taylor seated in the passenger seat. There was a light in the rear compartment which the deputies controlled in the cab. The deputies kept the light off while transporting plaintiff, though McKown testified at his deposition that he turned the light on and off several times while he was driving so that Taylor could assess plaintiff. (Doc. 41 at PAGEID#: 657-58).

The deputies began driving plaintiff to the Hamilton County Justice Center at 11:54 p.m. via I-74 to I-75. McKown took the Fifth Street exit off I-75 in downtown Cincinnati. The exit has

4

a sharp turn. Plaintiff fell off of the bench and onto the floor when the van took the sharp turn on the Fifth Street exit. Taylor turned the light on and saw that plaintiff had fallen. McKown pulled the van over and the deputies opened the back doors of the van. They saw that plaintiff was bleeding from a cut or scrape on his arm. They sat plaintiff back up in the van and McKown proceeded to drive to the Justice Center. As the van approached a stop, Taylor heard another noise, turned the light on, and saw that plaintiff had fallen again. McKown stopped the van and both officers went to the back of the van and checked on plaintiff again. They then proceeded to the Justice Center. As they drove, Taylor rode backwards facing plaintiff with the overhead light on in the rear compartment. Plaintiff's left wrist was swelling up from the fall.

When they arrived at the Justice Center, jail personnel refused to book plaintiff and told Taylor and McKown to take plaintiff to the emergency room. There he was diagnosed with two abrasions near his right elbow and his left wrist was put in a cast as a precautionary measure in case plaintiff had a fracture that was not disclosed by imaging.

## III. Qualified immunity standard

The qualified-immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Al-Lamadani v. Lang*, 624 F. App'x 405, 409 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court conducts a two-step inquiry when considering a claim for qualified immunity. *Id.* (citing *Pearson*, 555 U.S. at 232). At the first step, the court asks whether the facts viewed in the light most favorable to the plaintiff show that the officer has violated the plaintiff's constitutional right. *Id.* (citing *Pearson*, 555 U.S. at 232). At the second step, the court asks whether the right was clearly established at the time of the violation. *Id.* (citing *Pearson*, 555 U.S. at 232). "A right is clearly established if the contours of the right are

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal quotation marks, citation, and alterations omitted)). The court may consider the two steps of the inquiry in the order it chooses. *Id.* (citing *Pearson*, 555 U.S. at 242). Plaintiff has the burden to show that a defendant is not entitled to qualified immunity. *Id.* (citing *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. 2011)).

Whether the law was clearly established is evaluated "at the time of the challenged conduct," *see Ashcroft v. Abdullah Al-Kidd*, 563 U.S. 731, 741 (2011); *see also Hansen v. Aper*, No. 17-2220, 2018 WL 3997321, at *5 (6th Cir. Aug. 21, 2018). In deciding whether the right was clearly established, the Supreme Court has cautioned lower courts "not to define clearly established law at a high level of generality." *Abdullah Al-Kidd*, 536 U.S. at 742. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *O'Malley*, 652 F.3d at 667 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## IV.     Excessive force claims against defendants Taylor and McKown

Plaintiff brings two excessive force claims based on defendant McKown and Taylor's acts and omissions in connection with his transport to the Hamilton County Justice Center and hospital on the night of June 5, 2015: (1) McKown used excessive force by recklessly driving the van in which plaintiff was a passenger, and (2) McKown and Taylor used excessive force by handcuffing plaintiff too tightly and refusing to loosen the handcuffs. (Doc. 63 at 7). Defendants McKown and Taylor argue they are entitled to qualified immunity on plaintiff's excessive force claims. (Doc. 61 at 17-26).

## 1. Applicable standard

Excessive force claims can be resolved under the Fourth, Eighth or Fourteenth Amendments, depending on the plaintiff's status at the time of the incident. *Coley v. Lucas*, 799 F.3d 530, 537 (6th Cir. 2015). The threshold issue here is which of these constitutional amendments govern plaintiff's excessive force claims. Defendants initially argue in their motion for summary judgment that plaintiff's claims of excessive force in transporting and handcuffing him are properly analyzed under the Fourth Amendment and the due process clause of the Fourteenth Amendment, which they contend employ the same standard of "objective reasonableness" set forth in *Graham v. Connor*, 490 U.S. 386 (1989). (Doc. 61 at 17-18, citing *Hopper v. Plummer*, 887 F.3d 744 (6th Cir. 2018); *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). Defendants argue that as of the date of the incident giving rise to plaintiff's claims, there was no clearly-established right of a "detainee" to be secured by a seatbelt while being transported and no right to bring a claim for overly-tight handcuffing in the absence of a physical injury. (*Id.* at 18-20).

Plaintiff argues that because he was an "arrestee" rather than a prisoner or pretrial detainee at the time he was injured, his excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, so that the standards for claims brought under the Eighth or Fourteenth Amendments do not apply here. (Doc. 63 at 7). In support of his argument, plaintiff relies on a 2003 case from the Third Circuit, *Hughes v. Shestakov*, 76 F. App'x 450 (3d Cir. 2003), which held that the proper test in analyzing an excessive force claim is "objective reasonableness."[3] (*Id.* at 7-8).

---

[3] The *Hughes* Court did not address the issue of whether an arrestee's claim is properly analyzed under the Fourth Amendment and did not reach the question of qualified immunity.

In their reply, defendants again cite *Hopper*, 887 F.3d at 744, for the proposition that the Fourteenth Amendment applies here but they no longer advocate for application of the "objective reasonableness" standard that has long been applied in excessive force cases involving a search or seizure. (Doc. 67 at 8-9). Defendants adopt the position that at the time of plaintiff's injuries, he had already been seized (arrested), and his truck had already been searched, so his claims do not arise in the context of a search of seizure. However, they acknowledge that plaintiff was not yet a convicted prisoner protected by the Eighth Amendment. Defendants contend that plaintiff therefore fell into a "gray area" between free citizen and convicted criminal that is not governed by the "objective reasonableness" standard of the Fourth Amendment. (*Id.* at 8). Defendants instead argue that plaintiff's claims are appropriately analyzed under the Fourteenth Amendment "shocks the conscience" standard. (*Id.* at 8-10).

Under Sixth Circuit law, the governing amendment "depends on the plaintiff's status at the time of the incident: a free citizen in the process of being arrested or seized; a convicted prisoner; or someone in 'gray area[s]' around the two." *Coley*, 799 F.3d at 537 (citing *Burgess*, 735 F.3d at 472; *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002)). When the claim is that an officer "used excessive force during the process of an arrest, seizure, or investigatory stop" of a "free citizen," the Fourth Amendment governs. *Id.* The appropriate inquiry asks what was objectively "reasonable" under the circumstances. *Id.* (citing *Graham*, 490 U.S. at 396; *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008)). "These Fourth Amendment protections extend through police booking until the completion of a probable cause hearing." *Id.* (citing *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010)). When a convicted prisoner claims excessive force, the Eighth Amendment applies and prohibits the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment," and specifically "malicious and sadistic" conduct. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 5, 7 (1992) (quotations omitted)). The Fourteenth Amendment

applies to "free citizens not subject to search or seizure" and requires that the officers' conduct must "shock[ ] the conscience." *Id.* at 537-38 (quotations omitted). The Fourteenth Amendment also applies to excessive force claims brought by pretrial detainees, but the standard for a pretrial detainee's claim is whether "the force purposely or knowingly used against him was objectively unreasonable." *Id.* (quoting *Kingsley v. Hendrickson,* - U.S. -, 135 S. Ct. 2466, 2473 (2015) (quoting *Graham*, 490 U.S. at 395).[4]

It is clear that the Fourth Amendment applies to plaintiff's excessive force claims. The Sixth Circuit follows a "continuing seizure rule" under which "the seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers," and the Fourth Amendment "objective reasonableness" standard controls. *Aldini,* 609 F.3d at 865 (quoting *Phelps,* 286 F.3d at 300-01) (quoting in turn *McDowell v. Rogers,* 863 F.2d 1302, 1306 (6th Cir. 1988)). The Sixth Circuit has "acknowledged that Fourth Amendment protections do not vanish at the moment of arrest" and that its prior cases "refute the idea that the protection of the Fourth Amendment disappears so suddenly." *Aldini,* 609 F.3d at 865 (citing *Phelps,* 286 F.3d at 300). The Sixth Circuit found that such protections apply at least through the completion of the booking procedure, which is typically handled by jailers. *Id.* at 866 (citing *Phelps,* 286 F.3d at 300). The Court in *Aldini* confirmed the applicability of the Fourth Amendment from the time of arrest through at least the booking process and answered the question of how far the protection extends. *Aldini,* 609 F.3d at 865-66. The Sixth Circuit held that the dividing line was the probable cause hearing, so that the protections of the Fourth Amendment

---

[4] The Sixth Circuit indicated in *Coley* that whereas it was unclear prior to *Kingsley* which standard applied to a pretrial detainee's excessive force claim, the Supreme Court in *Kingsley* clarified that the inquiry to be made where a pretrial detainee brings an excessive force claim is whether the "force purposely or knowingly used against him was objectively unreasonable." *Id.* at 538. The Supreme Court issued its decision in *Kingsley* on June 22, 2015, a little over two weeks after the incident in this case.

apply to a detainee arrested without a warrant between the time of the arrest and the probable-cause hearing. *Id.* at 866-67.

The alleged excessive force in this case occurred after plaintiff's warrantless arrest and before he was booked on the charges against him. Thus, the Fourth Amendment governs plaintiff's excessive force claims. The analysis requires "balanc[ing] the consequences to the individual against the government's interests in effecting the seizure." *Morrison*, 583 F.3d at 401 (quoting *Burchett*, 310 F.3d at 944) (citing *Graham*, 490 U.S. at 396). There must be "a fact-specific inquiry based on the totality of the circumstances," including: (1) the severity of the crime involved, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by fleeing. *Id.* (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396)). The lawfulness of the officer's conduct must be judged "from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). If the plaintiff alleges excessive force during the course of an incident based on different grounds, the incident must be analyzed "in segments when assessing the reasonableness of a police officer's actions." *Id.* (court had to make separate qualified immunity determinations for the plaintiff's claims that (1) the officer refused to loosen her handcuffs; and (2) the officer pushed her face into the ground while she was handcuffed) (citing *Phelps*, 286 F.3d at 301).

## 2. Excessive force claim based on reckless driving

Plaintiff alleges that Deputy McKown used excessive force against him by driving recklessly. Plaintiff testified at his deposition that McKown took the sharp turn on the Fifth Street exit too fast, which resulted in plaintiff being thrown from the passenger bench. (Doc. 44 at PAGEID#: 910-911). Plaintiff alleges that after he fell from the bench, his right elbow was

bleeding. Plaintiff testified at his deposition that he yelled for help and the deputies told him to get up, stopped the van, sat him back up, refused to loosen his handcuffs, and laughed as they drove off. (*Id.* at PAGEID#: 910-12, 944; Doc. 45-1 at PAGEID#: 1013). Plaintiff testified that minutes later, the van came to an abrupt stop, he was again thrown from the bench and landed in a prone position on his stomach, and his wrist began swelling. (*Id.* at PAGEID#: 911-912, 945). Plaintiff testified that the deputies came to the back of the van and then they continued on to the jail, where jail personnel refused to book plaintiff and told the deputies to take him to the emergency room. (*Id.* at PAGEID#: 944-945; *see* Doc. 41, McKown Depo. at PAGEID#: 638). The deputies removed plaintiff's handcuffs and allowed him to ride to the hospital without handcuffs, where he was diagnosed with two abrasions near his right elbow and his left wrist was put in a cast for a possible scaphoid fracture. (Doc. 44 at PAGEID#: 928; Doc. 37, Taylor Depo. at PAGEID#: 146-47; Doc. 58 at PAGEID#: 1184).

Defendants rely on several cases for the proposition that the right of a detainee to be secured by a seatbelt was not clearly established as of June 5, 2015. The authorities they cite include an unpublished Sixth Circuit case which analyzed a detainee's claim that the arresting police officers "failed to exercise care" under the Fourteenth Amendment. *Anderson v. Theibert*, No. 16-4020, 2017 WL 3140581, at *3 (6th Cir. Feb. 27, 2017), *aff'g* No. 2:15-CV-00771, 2016 WL 4382726, at *5 (S.D. Ohio Aug. 16, 2016). The district court granted summary judgment on plaintiff's claim that the police officers "subjected him to danger by failing to fasten his seatbelt and failing to stop at traffic lights when transporting him in their police vehicle." *Theibert*, 2016 WL 4382726, at *5. The district court found "there is no constitutional right to be restrained by a seatbelt while transported in a police vehicle" and stated that numerous "federal courts have held that a failure to provide seatbelts during transport does not, by itself, constitute a risk of harm rising to the level of a constitutional violation." *Id.* (citing *Ricard v. P.T.S. of America, LLC*, No. 3:14-

CV-02308, 2015 WL 247883, at *2 (M.D. Tenn. Jan. 20, 2015) (citing *Smith v. Sec'y for the Dep't of Corr.*, 252 F. App'x 301, 303-04 (11th Cir. 2007); *Dexter v. Ford Motor Co.*, 92 F. App'x 637, 643 (10th Cir. 2004); *Ingram v. Herrington*, No. 4:06-CV-P65-M, 2007 WL 2815965, at *5 (W.D. Ky. Sept. 26, 2007); *Young v. Hightower*, No. 04-10309, 2007 WL 2214520, at *12-13 (E.D. Mich. July 27, 2007)). The Sixth Circuit affirmed, noting that "courts have generally found that law enforcement officials do not threaten the reasonable safety of detainees by failing to provide seatbelts during transportation." *Anderson v. Theibert*, No. 16-4020, 2017 WL 3140581, at *3 (6th Cir. Feb. 27, 2017) (citing *Ricard*, 2015 WL 247883, at *2; *Smith*, 252 F. App'x at 303-04; *Dexter*, 92 F. App'x at 643).

Plaintiff agrees that there is no "per se constitutional right to be seat-belted while being transported by a government official." (Doc. 63 at 9, n. 1). However, plaintiff argues that this case involves more than defendants' failure to secure him with a seat belt and involves excessive force through reckless driving while he was handcuffed and not wearing a seatbelt, resulting in injuries to him. (*Id.*). Plaintiff argues that causing injury in this manner is a use of excessive force that violates an arrestee's Fourth Amendment rights. Plaintiff also claims that the right was clearly established at the time of the incident such that a reasonable officer could not have reasonably believed that this conduct was lawful. (*Id.* at 9, citing *Scott v. Becher*, 736 F. App'x 130, 133-34 (6th Cir. 2018) (finding a constitutional violation under the Eighth Amendment standard of "malicious and sadistic infliction of pain and suffering" for "driving recklessly while [the plaintiff] and the other prisoners were not wearing seatbelts."); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (rights of individuals who have not been convicted of a crime "are at least as great as the Eighth Amendment protections available to a convicted prisoner.")).

In reply, defendants argue that *Scott* does not apply here for three reasons. First, they note that plaintiff admits there is no constitutional right to be seat-belted while being transported by a

12

government official; second, defendants contend there is no evidence of "any reckless driving, swerving, careening, or general reckless driving," and instead plaintiff testified at his deposition that McKown was not driving "drastically fast"; and third, defendants argue that plaintiff's deposition testimony does not indicate that he asked McKown to slow down, both deputies deny laughing at plaintiff, and plaintiff testified he could not precisely remember certain other details about the night. (Doc. 67 at 10-11). Defendants argue that under the Fourteenth Amendment "shock the conscience test," there is no genuine issue of material fact as to whether McKown's driving was "malicious, sadistic and done only to cause harm." (*Id.* at 11). Defendants also argue that even if the Fourth Amendment "objective reasonableness" standard applied, there is no genuine issue as to whether they used excessive force. Defendants allege they took the reasonable steps of checking on plaintiff after each fall; plaintiff did not inform them he suffered from sleep apnea or was excessively intoxicated due to his medical conditions and alcohol intake; and defendants could reasonably assume based on their prior experience of transporting individuals arrested for driving under the influence that plaintiff would obey verbal and written instructions to "hang on to the strap." (*Id.* at 11-12).

There is no dispute that failing to seatbelt an arrestee, standing alone, does not give rise to a Fourth Amendment violation. *Cf. Scott*, 736 F. App'x at 133-34 (failing to seatbelt a convicted prisoner does not violate the Eighth Amendment). However, as of June 5, 2015, no reasonable corrections official could believe that it was legal to intentionally drive a motor vehicle in a reckless manner so as to cause injury to an arrestee who was handcuffed but not seat-belted. The Sixth Circuit in *Scott* cited a number of cases predating June 2015 that lead to this conclusion:

> Scott points to factually similar cases out of the Eighth and the Fifth Circuits that analyzed under the Eighth Amendment allegations of reckless driving while transporting an inmate without a seatbelt. In *Brown v. Fortner*, 518 F.3d 552, 561 (8th Cir. 2008), the Eighth Circuit held that a reckless prison driver violated the (un-seat-belted) plaintiff's clearly established Eighth Amendment rights. The court concluded that the driver had "fair warning" that his actions were illegal, even

though the only caselaw on point was a two-paragraph, 14-year-old unpublished decision. *Id.* Relying on *Fortner*, the Fifth Circuit reversed a dismissal under the Prison Litigation Reform Act of an Eighth Amendment claim brought by a prisoner who alleged that he was injured when the prison van driver drove recklessly, sped, and swerved, resulting in a sudden stop that threw the plaintiff from his seat. *Rogers v. Boatright*, 709 F.3d 403, 408-09 (5th Cir. 2013).

Although a number of circuits have not addressed the specific reckless use of a vehicle to harm an inmate, "there is a clear consensus among the circuits" that "the Eighth Amendment protect[s] against the malicious and sadistic infliction of pain and suffering. . . in a diverse range of factual scenarios." *Thompson [v. Commonwealth of Va.*, 878 F.3d [89,] 103, 105 [4th Cir. 2017]. And to use a vehicle maliciously to harm an inmate falls squarely into that category-especially when there is no risk posed by the inmate and no legitimate penal interest. *See id.* A "rough ride" is "a peculiarly cruel means of punishment, as [it] is designed to place the victim in fear for his life. Not only is the prisoner not able to protect himself, but motor vehicles, unlike a controlled spray or direct applications of force, are not designed for use as a means of securing compliance or otherwise subduing a prisoner." *Id.* at 103.

What is more, cases that find no violation of the Eighth Amendment help Scott, too. Post-*Fortner* cases have found no Eighth Amendment violations for simply failing to seatbelt inmates. *See Jabbar v. Fischer*, 683 F.3d 54, 58-59 (2nd Cir. 2012). But those cases buttress *Fortner*'s conclusion by explaining that a failure to secure an inmate with a seatbelt alone is not an Eighth Amendment violation, in part because it does not rise to the level of what the driver did in *Fortner*. *See id.* at 58; *Fluker v. Cty. of Kankakee*, 945 F. Supp.2d 972, 989 (C.D. Ill.) (calling *Fortner*'s conclusion an "unexceptional proposition"), *aff'd*, 741 F.3d 787 (7th Cir. 2013); *see also Fouch v. District of Columbia*, 10 F. Supp.3d 45, 51 (D.D.C. 2014); *Titus v. Unger*, No. 8:12-CV-261, 2013 WL 5937328, at *12 (D. Neb. Nov. 4, 2013). In other words, failure-to-seatbelt cases "involved mere negligence," but "all cases that have squarely dealt with intentional misconduct"- which Scott has alleged here - "have found an Eighth Amendment violation." *Thompson*, 878 F.3d at 105-06.

In light of the obviousness of the constitutional violation, Becher could not reasonably have believed that driving recklessly while Scott and the other prisoners were not wearing seatbelts was lawful. Accordingly, the district court erred in granting Becher qualified immunity on Scott's Eighth Amendment claim of deliberate-indifference by reckless driving.

*Scott*, 736 F. App'x at 133-34.

Although *Scott* was decided under the Eighth Amendment, the law set forth in the decision applies to plaintiff's Fourth Amendment claim. The court acknowledged in *Scott*, as plaintiff does here, that an individual has no per se constitutional right to be seat-belted while being transported

by a government official. But when an officer engages in additional acts that rise to the level of the "malicious and sadistic infliction of pain and suffering" or that violate the "objectively reasonable" standard of the Fourth Amendment, a constitutional violation occurs. A reasonable official would have been on notice of the applicable law set forth in *Scott* prior to June 2015.

Applying the governing law here, the Court finds there are several material facts in dispute which preclude a grant of summary judgment in defendants' favor on plaintiff's Fourth Amendment reckless driving claim. First, the parties dispute whether McKown took the Fifth Street exit too fast. Defendants contend it is undisputed that McKown did not drive too fast on the exit, but this is not accurate and they mischaracterize plaintiff's deposition testimony on this point. McKown testified at his deposition that he checked his speedometer when he passed the 50-mph speed limit sign to his left at the Fifth Street exit before exiting I-75, and he was driving 45 to 50 mph. (Doc. 41 at PAGEID#: 674). He also testified that he remembered checking his speed during the turn on the Fifth Street exit when he heard a sound and Taylor said that plaintiff had fallen, and he saw when he looked at his speedometer that he was going 20 mph. (*Id.* at PAGEID#: 675). Plaintiff testified that when McKown first started driving toward the Justice Center, the van was going at a "fairly fast rate of speed, maybe 60, 70 miles an hour, which isn't . . . drastically fast," but this was before they came to a sharp turn. (Doc. 44 at PAGE ID#: 910). According to Lieutenant Peter Enderle, the HCSO patrol night watch commander at the time, plaintiff told him that "when they went around a curve. . ., he felt they were traveling too fast, which threw him off the bench." (Doc. 39 at PAGEID#: 326, 346). This evidence, if resolved in plaintiff's favor, supports a finding that McKown drove too fast for the sharp turn on the Fifth Street exit. Resolution of this factual question requires findings as to the parties' credibility, which the Court cannot make on summary judgment.

There is also conflicting deposition testimony about whether the second fall occurred when McKown came to an abrupt stop. According to Enderle, both deputies and plaintiff recalled in their post-incident interviews that plaintiff fell when the van was coming to a stop. (*Id.* at PAGEID#: 369). Plaintiff told Enderle that the van traveled a short distance after the first fall and then "came to a real abrupt stop, which, again, caused him to come off the bench." (*Id.* at PAGEID#: 347). McKown testified on the one hand that he did "not even touch the brakes" when plaintiff fell the second time. (Doc. 41 at PAGEID#: 635). On the other hand, McKown testified that he was coming to a stop when plaintiff fell. (*Id.* at PAGEID#: 648). Taylor told Enderle in her post-incident interview that McKown was driving "easily" because it appeared that plaintiff was falling asleep. (Doc. 39 at PAGEID#: 352). She stated plaintiff fell the second time as McKown was coming to a stop at the stoplight. (*Id.*). A reasonable trier-of-fact could resolve any discrepancies in the deposition testimony in plaintiff's favor and find based on this evidence that plaintiff was thrown off the bench and fell the second time when McKown brought the van to an abrupt stop.

Based on all the evidence, a trier-of-fact could construe the conflicting deposition testimony in plaintiff's favor and conclude that he was intoxicated, he was seated on a bench in a dark van in handcuffs, and he was not seat-belted. The factfinder could reasonably infer from this evidence that plaintiff was thrown from the bench and injured when the van was operated in a reckless manner; specifically, when McKown took a sharp turn too fast and came to an abrupt stop. Enderle conceded this point at his deposition by testifying that if McKown took the turn too fast and came to a sudden stop, it could topple an unrestrained passenger, particularly if he had been drinking. (Doc. 39 at PAGEID#: 366-367).

Finally, there are multiple factual issues underlying the question of defendants' intent that cannot be resolved on summary judgment, including whether the deputies took precautions to

transport plaintiff safely, whether they sought medical attention for plaintiff after he fell, and whether they contacted a supervisor after plaintiff was injured. McKown testified at his deposition that throughout the ride, plaintiff "appeared to be unsteady" and was fading in and out of consciousness, and McKown was "concerned for him." (Doc. 41 at PAGEID#: 660). McKown testified that defendants turned the light on and off several times during the transport so they could assess plaintiff's well-being. (*Id.* at PAGEID#: 657-58). Plaintiff testified that after the first fall, he heard the deputies laughing in the front seat. (Doc. 44 at PAGEID#: 41). Taylor testified that after the second fall, she told McKown to leave the light on in the van until they reached the jail; she rode backwards in her seat to watch plaintiff; she spoke to plaintiff as he was nodding off and she "holler[ed] and bang[ed]" on the metal screen between the cab and the passenger compartment; and McKown said, "[S]ir, are you okay," to wake plaintiff up. (Doc. 37 at PAGEID#: 134-35). Enderle testified that Taylor told him that she was talking to plaintiff through the screen that separated the cab from the passenger compartment to keep him awake between the second fall and the Justice Center. (Doc. 39 at PAGEID#: 352-53). Enderle's interview notes do not reflect that Taylor told him she banged on the screen to keep plaintiff awake. (Doc. 39 at PAGEID#: 355-56). Further, according to McKown, neither he nor Taylor banged on the screen. (Doc. 41 at PAGEID#: 664).

There is also disputed deposition testimony as to whether the officers asked plaintiff if he needed an ambulance or offered to call one for him. McKown testified that he "asked at least numerous times if [plaintiff] wanted an ambulance." (Doc. 41 at PAGEID#: 635). After plaintiff fell the second time, McKown testified he asked plaintiff again if he wanted an ambulance, but plaintiff said he did not need one. (*Id.* at PAGEID#: 636). McKown also testified that although he asked plaintiff twice if he needed an ambulance and jail personnel told the deputies to take plaintiff to the hospital because of his injuries, McKown did not call an ambulance for plaintiff. (*Id.* at

17

PAGEID#: 638-39). The testimony as to whether the deputies called a supervisor after plaintiff sustained his first or second injury, or only after they arrived at the hospital, is unclear. McKown testified that the deputies contacted a supervisor with the HCSO at some point after plaintiff fell in the van. (*Id*. at PAGEID#: 636). McKown testified he also called Enderle when they arrived at the hospital, but he was not sure if Enderle was the same supervisor he had spoken with when they were en route to the Justice Center. (*Id*. at PAGEID#: 664). Taylor testified they were not on Fifth Street when she called Enderle, but she recalled that Enderle went to the hospital when she called him. (Doc. 39 at PAGEID#: 397). Enderle testified that Taylor first notified him about plaintiff and informed him that the individual they were transporting was injured, and his understanding was they were at the hospital. (*Id*. at PAGEID#: 334). He later testified he did not know the deputies' location when they called him. (*Id*. at PAGEID#: 376). Enderle testified that he went to the hospital and the deputies were in the room with plaintiff. (*Id*. at PAGEID#: 335). Enderle observed that plaintiff's right arm had an abrasion and some dried blood around it, and the left hand was swollen and discolored and there were bruises up his arms. (Doc. 39 at PAGEID#: 338-39). Thus, it is clear that defendants contacted a supervisor, but it is not clear how soon it was after plaintiff's initial fall that they did so.

Consistent with *Scott*, this evidence is sufficient to create a genuine issue of material fact as to whether defendant McKown used excessive force by intentionally driving recklessly while transporting plaintiff and causing injury to him. Defendant McKown is not entitled to qualified immunity on this claim. "In light of the obviousness of the constitutional violation, [defendant] could not reasonably have believed that driving recklessly while [plaintiff was] not wearing [a]

seatbelt[] was lawful." *Scott*, 736 F. App'x at 133-34. Defendants' motion for summary judgment is denied on the Fourth Amendment claim for reckless driving.[5]

### 3. Excessively forceful handcuffing claim

The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure. *Morrison*, 583 F.3d at 401 (citing *Kostrzewa*, 247 F.3d at 639). The Sixth Circuit analyzes an "'excessively forceful handcuffing' claim under the general excessive force rubric." *Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997). For a handcuffing claim to survive summary judgment, the plaintiff must offer sufficient evidence to create a genuine issue of material fact that: "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Morrison*, 583 F.3d at 401 (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005)).

In support of his Fourth Amendment handcuffing claim against both McKown and Taylor, plaintiff alleges that he asked for his handcuffs to be loosened twice; the deputies ignored or refused his requests; and the tight handcuffs caused injuries. Plaintiff alleges that when the deputies handcuffed him, he "told them the handcuffs were too tight, that he was on a blood thinner, and he asked for the handcuffs to be loosened." (Doc. 63 at 2, citing Doc. 44 at PAGEID#: 909-10). He alleges that Taylor responded by telling him "to live with it" and they were not going to loosen the handcuffs, after which the deputies placed him in the van. (*Id.*). Plaintiff indicates he was not aware there was a strap but even if he knew one was there, "it would have been impossible for him to hold onto it because he was tightly handcuffed with his palms together." (*Id.* at 3, citing

---

[5] The Court need not address the Fourth Amendment claims brought against defendants in their official capacity or the § 1983 claims brought against the Hamilton County Special Deputy Sheriffs, Inc. (HCSDS). Plaintiff has decided to not pursue his § 1983 claims against the county for failure to train and supervise and for ratification. (Doc. 63 at 17). Plaintiff has not addressed defendants' arguments that the HCSDS must be dismissed from the lawsuit in his memorandum in opposition to the motion to dismiss/motion for summary judgment.

Doc. 44 at PAGEID#: 913-15). Plaintiff alleges he suffered an injury to his right elbow when Deputy McKown took the sharp turn on the Fifth Street exit too fast and plaintiff was thrown from the bench he was seated on in the passenger compartment of the van. (*Id*. at PAGEID#: 910-11). Plaintiff's right elbow was bleeding, and he alleges he asked that the handcuffs be loosened but Taylor responded, "No, you're going to live with it." (*Id*., citing Doc. 44 at PAGEID#: 944; Doc. 45-1 at PAGEID#: 1013). Plaintiff alleges he was thrown from the bench again and landed in a prone position on his stomach when McKown came to an abrupt stop moments later. (Doc. 63 at 4, citing Doc. 44 at PAGEID#: 911-12). Plaintiff alleges he "tried to catch himself, but the handcuffs were so tight that he could not." (*Id*, citing Doc. 44 at PAGEID#: 912). When asked at his deposition what injuries he suffered when he fell the second time, plaintiff testified that he tried to catch himself when he fell the second time and, "I could tell that my- -my wrist was swelling up." (Doc. 44 at PAGEID#: 945; Doc. 45-1 at PAGEID#: 1014). At the hospital, plaintiff was diagnosed two abrasions near his right elbow and his left wrist was put in a cast due to a possible left scaphoid fracture. (Doc. 44 at PAGEID#: 928). X-rays of his elbow were negative for any fractures. (*Id*. at PAGEID#: 932). X-rays of the left hand showed dorsal soft tissue swelling with no acute fracture or dislocation. (Doc. 54, Exh. S).

Plaintiff has thus made two allegations as to how excessively tight handcuffs caused the injuries he sustained during the van ride: (1) they precluded him from holding on to the strap behind him, which caused him to fall when McKown went too fast around the sharp turn on the Fifth Street exit; and (2) the excessively tight handcuffs prevented him from breaking his fall when McKown came to a sudden stop moments later and directly led to the left wrist injury he sustained in that fall.

Defendants contend they are entitled to qualified immunity on plaintiff's excessively forceful handcuffing claim because plaintiff has not pled or provided evidence "of a causal

connection between the tightness of his handcuffs and the injury to his wrist." (Doc. 61 at 20).
Rather, they contend that plaintiff identifies McKown's reckless driving as the cause of both
injuries; i.e., plaintiff alleges that McKown drove recklessly and caused his first fall, which
resulted in the initial injury to his right arm, and McKown abruptly stopped the van and caused the
second fall, which resulted in his wrist injury.[6]  (*Id.*).

Plaintiff has offered evidence that is sufficient to satisfy the first two prongs of an
excessively forceful handcuffing claim. Plaintiff alleges that he twice complained that the
handcuffs were too tight.  Plaintiff testified at his deposition that when the officers initially
handcuffed him, he "told them that the cuffs were extremely tight on me and I was on a blood
thinner, Coumadin. And I asked if they - - they could loosen them." (Doc. 44 at PAGEID#: 909).
Plaintiff testified that after the first fall, when the deputies came to the back of the van, he "asked
them again if they could please loosen the tightness of my handcuffs. . . ." (*Id.* at PAGEID#: 944).
McKown testified that at some point, plaintiff asked to have his handcuffs loosened. (Doc. 41 at
PAGE ID#: 645-46).   Taylor does not remember plaintiff complaining about his handcuffs being
too tight and does not remember any conversation about the handcuffs. (Doc. 37 at PAGEID#:
129). The parties' conflicting deposition testimony is sufficient to establish a factual dispute as to
the first prong of plaintiff's Fourth Amendment handcuffing claim.

Plaintiff's deposition testimony is also sufficient to create a genuine issue of material fact as
to the second prong of his excessively forceful handcuffing claim. The Sixth Circuit has held that a

---

[6] Defendants also rely on the deposition testimony of an opinion witness, Herbert Hood, and the declaration of Dr.
Vincent Koenigsknecht, the radiologist on duty the night plaintiff was brought to the hospital for treatment, to establish
that the handcuffs themselves were not the cause of the injuries to plaintiff's elbow and hand. (*Id.*, citing Doc. 40;
Doc. 50 at PAGEID#: 1124).  Plaintiff alleges this evidence is not properly considered on summary judgment to
determine the cause of plaintiff's injuries. (Doc. 66).  It is not necessary to consider this evidence to decide whether
there are genuine issues of material fact that preclude granting summary judgment in defendants' favor.  The Court
therefore will not address the parties' dispute concerning the competency of the evidence at the summary judgment
stage.

"dismissive response from an officer is sufficient to meet the second prong of a claim for excessively forceful handcuffing; that is, a plaintiff can survive summary judgment even if the officer gave some reply to plaintiff's complaint if the response was essentially non-responsive." *See Baynes v. Cleland,* 799 F.3d 600, 609 (6th Cir. 2015) (citing *Morrison,* 583 F.3d at 402) ("finding that plaintiff could 'easily satisfy' the second prong" of an excessive force claim where the officer claimed to have responded to the complaint "by sticking his finger in between the handcuffs and [plaintiff's] skin to make sure [the handcuffs] were not 'too tight'" and told the plaintiff "he could place the handcuffs on 'as tight as he wanted to and that's how they were staying.'"). Plaintiff alleges that in response to his complaints, Taylor told him to "live with it" and "she wasn't - - they wasn't going to loosen them" before putting plaintiff in the van. (Doc. 44 at PAGEID#: 909-10). Plaintiff testified that when defendants came to the back of the van after the first fall, he "asked them again if they could please loosen the tightness of my handcuffs . . . [a]nd again the female, Ms. Taylor, stated, no, you're going to live with it." (Doc. 44 at PAGEID#: 944). McKown acknowledged at his deposition that Taylor said something in response to plaintiff's complaints or requests, but he does not recall whether she said, "live with it." (Doc. 41 at PAGEID#: 651-52). McKown testified he eventually loosened plaintiff's handcuffs, but not until they arrived at the jail. (Doc. 41 at PAGEID#: 645-46). This deposition testimony, if credited, shows defendants were not responsive to plaintiff's complaints that his handcuffs were too tight. Plaintiff has carried his burden on summary judgment to satisfy the second element of his Fourth Amendment handcuffing claim.

However, plaintiff has not proffered testimony or other evidence that is sufficient to create a genuine issue of fact as to the third prong of his excessively forceful handcuffing claim. This case does not involve the typical factual scenario presented by an excessive force claim based on handcuffing. Plaintiff does not allege that too-tight handcuffs injured him by exerting pressure or

impinging on his hands or wrists. *See, e.g., Baynes,* 799 F.3d at 609 (the plaintiff's deposition testimony that he could not "feel his fingers because of the tightness of the handcuffs, and that he still experiences periodic numbness in his fingers," was sufficient to create a genuine issue of material fact as to whether the plaintiff suffered a physical injury as a result of too-tight handcuffs) (citing *Morrison,* 583 F.3d at 402-403) (the "plaintiff's testimony that she suffered wrist marks and bruising from the handcuffs was sufficient to establish the necessary 'physical injury'"); *Martin,* 106 F.3d at 1310, 1312-13 (qualified immunity was not warranted and genuine issue of material fact existed as to whether the defendant officer used excessive force where "the plaintiff complained of excessive force by being handcuffed so tightly that his hands became numb and swollen during the ride to jail and wait in a holding cell"). The gist of plaintiff's claim here is that he was injured in two separate falls from the bench in the van, and his too-tight handcuffs contributed to his injury because they prevented him from stabilizing himself and from breaking his fall. Plaintiff specifically alleges that each time he was thrown from the seat, "the handcuffs dug into his wrists and prevented him from stabilizing himself," and "between the tightness of his handcuffs and the impact of the fall, his left hand and wrist were injured." (Doc. 63 at 12, citing PAGEID#: 945). However, plaintiff has not introduced any competent evidence which permits an inference that slightly looser handcuffs would have prevented his injuries so as to create a genuine issue as to whether his injuries "resulted" from too-tight handcuffs. *See Jackson v. Lubelan,* 657 F. App'x 497, 500 (6th Cir. 2016).

To show there is a genuine factual dispute as to whether his injuries were caused by too-tight handcuffs, plaintiff relies on his deposition testimony. Plaintiff states in response to defendants' motion for summary judgment that he "testified he was handcuffed so tightly he could not hold onto the strap in the rear of the van, nor could he balance or stabilize himself in any other way." (Doc. 63 at 12). Plaintiff testified at his deposition that when "they cuffed me, I told them

that the cuffs were extremely tight on me, and I was on a blood thinner, Coumadin. And I asked if they -- they could loosen them." (Doc. 44 at PAGEID#: 909). Plaintiff testified that defendant Taylor refused and the deputies put him in the van. (*Id.* at PAGEID#: 910). Plaintiff testified he injured his elbow when the van took a sharp turn and he was thrown to the floor. (Doc. 44 at PAGEID#: 911). Plaintiff testified that he was not holding on to the strap when he fell, but he did not remember whether he had been told to hold on to the strap; whether he had seen a sign in the van advising passengers to hold on to the strap (Doc. 52, Exh. M)[7]; and whether a light was on in the passenger compartment of the van when he got in which would have enabled him to see the sign. (Doc. 44 at PAGEID#: 912-13). Plaintiff testified that he would not have been able to hold on to the strap even if he had been told to do so because of "the way my hands were cuffed anyway," but it is apparent from plaintiff's full testimony on this point there is no factual basis for his testimony that his handcuffs made it physically impossible for him to hold onto the strap. Plaintiff testified as follows:

> Q. Were you holding on?
> A. No.
> Q. Why not?
> A. I wasn't told to.
> Q. So you weren't told to, or you don't remember being told to hold on.
> A. I don't remember being told to hold on.
> Q. Do you remember - - this is Exhibit M.
> Do you remember that sign in the van?
> A. No.
> Q. It would have been right across from where you were sitting.
> A. Well, it was dark back there, and I couldn't see.
> Q. When they put you in the van, the light was on, right?
> A. I don't - - I don't remember.
> Q. So you didn't see the straps?
> A. No.
> I was intoxicated.
> - - -

---

[7] Exhibit M reads: "Hold on to Straps When Vehicle is in Motion" and depicts two hands grasping a strap. (Doc. 52-1 at PAGEID#: 1153).

If they would have told me to hold onto the strap, I couldn't have done it the way my hands were cuffed anyway. Because I had no - - I had no flexibility in being able to do anything like that.

. . . .

When you're handcuffed and your palms are together, how are you supposed to be able to grasp anything?

Q.  You can turn your hands. You could turn your hands, couldn't you?
A.  No, not really.

. . . .

The cuffs were on really tight.

. . . .

(Doc. 44 at PAGEID#: 913-15). Plaintiff testified that he both "didn't know to hold on" and that he could not hold on. (*Id.* at PAGEID#: 915).

Thus, according to plaintiff's deposition testimony, he does not remember whether he tried to hold on to the strap, he was not aware there was a strap, and he never saw the strap. Plaintiff therefore has no personal knowledge as to whether he was physically unable to hold on to the strap behind him because of the manner in which he was handcuffed, and no way of knowing whether too-tight handcuffs contributed to his elbow or wrist injury. Plaintiff's testimony that, "I couldn't have [held onto the strap] the way my hands were cuffed anyway," is conjectural. The testimony is insufficient to create a genuine issue of fact as to whether too-tight handcuffs prevented him from holding the strap in the van and whether his falls and resulting injuries would not have occurred had his handcuffs been loosened. *See Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 371 (6th Cir. 2013) (citing, e.g., *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932-33 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment") (emphasis in original)).

Plaintiff's claim that too-tight handcuffs contributed to his wrist injury by preventing him from breaking his fall with his left hand when the van came to an abrupt stop and he was thrown from the bench a second time is also based on conjecture. Plaintiff testified at his deposition that he was thrown off the bench "belly flat, prone position, on my stomach." (Doc. 44 at PAGEID#:

25

912). He testified that he was "going down that time, I tried to catch myself with my-- my left hand. But the cuff was so tight and everything that I - - I couldn't manipulate anything." (*Id.*). He further testified, "[I] tried to catch myself with my-- because my right elbow was already injured-- tried to catch myself with my left and--even though I was in handcuffs," and he could tell his wrist was swelling up. (*Id.* at PAGEID#: 945). This testimony supports an inference that plaintiff could not stop his second fall because he was handcuffed behind his back. But this testimony does not support a reasonable inference that if the deputies had loosened his handcuffs prior to the second fall, plaintiff would have been able to "catch [him]self" with his left hand before falling onto his stomach when the van came to sudden stop. Thus, the evidence plaintiff has proffered is not sufficient to create a genuine issue of fact on the injury element of his excessively forceful handcuffing claim.

Because plaintiff has not come forward with evidence to establish a violation of his Fourth Amendment rights based on excessively forceful or tight handcuffing, defendants are entitled to qualified immunity under the first prong of the qualified immunity analysis.

Even if plaintiff's evidence were sufficient to create a genuine factual dispute as to whether too-tight handcuffs prevented him from grasping the strap in the van or breaking his fall from the bench, plaintiff has failed to carry his burden to show that defendants would not be entitled to qualified immunity under the second prong of the qualified immunity analysis. An arrestee's right to be free from unduly tight or excessively forceful handcuffing has long been established. However, plaintiff has not cited case law to show that a claim for excessively forceful handcuffing has been recognized where the arrestee does not allege injury resulting from the handcuffs themselves or the direct application of physical force to the arrestee after he has been handcuffed and subdued.

The constitutional prohibition against unduly tight or excessively forceful handcuffing in the course of an arrest was clearly established for qualified immunity purposes as early as 1991. *Baynes*, 799 F.3d at 613 (collecting cases). The Sixth Circuit has recognized since 1991 that freedom from "excessively forceful handcuffing" is included in the Fourth Amendment right to be free from excessive force. *Martin*, 106 F.3d at 1313 (citing *Walton v. City of Southfield*, 995 F.2d at 1331, 1342 (6th Cir. 1993) (court denied qualified immunity on the plaintiff's excessive force claim where facts as to whether the arresting officer knew the plaintiff had an injured shoulder when he handcuffed her were disputed)). *See also Jackson*, 657 F. App'x at 501 (the Fourth Amendment bars "the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger") (citing *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009)). The Sixth Circuit in *Jackson* acknowledged that there was undoubtedly "a clearly established legal norm" precluding the use of "violent physical force" against a subdued criminal suspect prior to 2016. *Id.* (citing *Cochran v. Shelby Township*, No. 2:13-CV-11756, 2014 WL 4639467, at *3 (E.D. Mich. Sept. 16, 2014); *Trimble v. Parisek*, No. 11-12932, 2013 WL 5449571, at *5 (E.D. Mich. Sept. 30, 2013)).

The district court in *Cochran* denied qualified immunity on a portion of the plaintiff's claim in accordance with this clearly-established norm. The court separately considered the plaintiff's handcuffing claims and found that the defendant officers were entitled to qualified immunity on the first segment of the plaintiff's claim, which alleged that the defendant officers had handcuffed her too tightly and ignored her complaints about the too-tight handcuffs, on the ground that the plaintiff failed "to satisfactorily prove she experienced some physical injury resulting from her handcuffing." *Cochran*, 2014 WL 4639467, at *7-8. The court found that even though the plaintiff alleged that she suffered left elbow pain as a result of her detainment, she offered no evidence that the pain "was a result of the allegedly too tight handcuffing." *Id.* Thus, the evidence

27

did not suffice to create a genuine issue of fact that the defendant officers violated her constitutional rights "when handcuffing her." *Id.*

On the other hand, the *Cochran* court found that the plaintiff had produced sufficient evidence to survive summary judgment on the second segment of her excessive force claim, which alleged that the officers used excessive force "when they pulled her up by the chain between her handcuffs . . . despite the fact that she never resisted [their] attempts to detain her, and caused her to suffer significant pain in her elbow." *Id.* The court noted that the Sixth Circuit had consistently held that "use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law," *Morrison,* 582 F.3d at 406, and the Sixth Circuit had previously indicated that "pulling on the chain between a detainee's handcuffs once they were detained could constitute an excessive use of force." *Id.* (citing *Vance v. Wade,* 546. F.3d 774, 783 (6th Cir. 2008)).

In *Trimble,* 2013 WL 5449571, at *5, the district court denied qualified immunity on the plaintiff's excessive force claim under the Fourth Amendment. The court considered the "totality of the circumstances" to determine whether the use of physical force against the handcuffed plaintiff was "objectively reasonable." *Id.* at *3-4. The court found that "taking Plaintiff's proofs as true, he was subdued in handcuffs and lying on the ground when [the defendant officer] pulled him up by the handcuffs, causing pain and injury to his wrist requiring medical treatment," and nothing in the record indicated "that this was a necessary or appropriate way to lift Plaintiff from the ground." *Id.*

The Sixth Circuit in *Jackson* upheld the grant of qualified immunity to the defendant officers on the plaintiff's claim that he was injured "when they placed him in tight handcuffs, pulled up on his handcuffs, and left him seated in an awkward position in the backseat of a police cruiser," resulting in "a pinched nerve in his neck and pain in his hand." *Jackson,* 657 F. App'x at 498. The court found that "no case permits an excessive force claim for overly tight handcuffing in

the absence of a physical injury caused by the handcuffing and [] no case permits such a claim for the run-of-the-mi[ll] lifting of the handcuffs to help Jackson get into the police cruiser." *Id*. The Sixth Circuit distinguished *Cochran* and *Trimble* on the ground the officers in *Jackson* did not use "violent physical force against a criminal suspect who already has been subdued and does not present a danger" and did not "lift [the plaintiff] from the ground using only his handcuffs"; instead, they "merely 'lifted up'" on the plaintiff's handcuffs to assist him into the car. *Jackson*, 657 F. App'x at 501. Addressing what it construed as "the heart" of the plaintiff's claim - that it was the combination of events that amounted to excessive force and caused his injuries - the court stated:[8]

> The problem is that, while handcuffing someone so tightly that the handcuffs themselves cause injury is indeed a clearly established violation of the Fourth Amendment, *see Baynes*, 799 F.3d at 610-17, handcuffing someone just tightly enough that an awkward arm placement or a minor lift causes an injury is not. That is true even when the suspect complains to the officers. *See O'Malley v. City of Flint*, 652 F.3d 662, 672 (6th Cir. 2011).

*Id*. at 502.

Although "a case directly on point" is not required for a right to be clearly-established, the state of the law at the time of the action giving rise to the claim must have been such as to give the defendants fair warning that their actions violated the plaintiff's constitutional rights. *Baynes*, 799 F.3d at 614 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Plaintiff has not provided any authority which indicates that as of June 5, 2015, a reasonable officer would have been on notice that there was anything about the manner in which defendants handcuffed or transported plaintiff that violated the Fourth Amendment prohibition against excessively forceful handcuffing. *Jackson*

---

[8] The Court noted: "In describing the events, Jackson attributes his injuries largely to this awkward entry and positioning in the car. "[T]he cuffs were too tight for one, and then when they pushed me up in the car it pinched something, so that's what caused the discomfort and the pain and I guess what caused everything else. . . . I was just in a lot of pain by the cuffs, and, like I said, if they would have seated me . . . differently I think it might have alleviated the pain or maybe not even caused the pinching of the nerves up in my neck. It's the way that they place you in those cars initially that makes a big difference." *Id*. at 499.

and the cases it cites establish that there was support in the case law for an excessively forceful handcuffing claim under the Fourth Amendment as of June 5, 2015; however, "no case permit[ted] an excessive force claim for overly tight handcuffing in the absence of a physical injury caused by the handcuffing," such as bruising or nerve impingement. *Jackson*, 657 F. App'x at 502. Plaintiff points to no evidence in the record that demonstrates a causal connection between his too-tight handcuffs and the physical injuries he sustained. Further, unlike the cases that preceded *Jackson* where courts found that the use of violent physical force against a handcuffed and subdued individual could constitute a Fourth Amendment violation, plaintiff does not allege that defendants used "violent physical force" by pulling or yanking on any part of his handcuffs or that they applied direct physical force to any part of his body. *See Cochran*, 2014 WL 4639467, at *3; *Trimble*, 2013 WL 5449571, at *5. Thus, defendants are entitled to qualified immunity and to summary judgment as a matter of law on plaintiff's claim that defendants subjected him to excessively forceful handcuffing in violation of his Fourth Amendment rights.

### 4.    Negligence claims against Taylor, McKown and Hamilton County

Plaintiff brings claims for negligence under Ohio law against defendants Taylor, McKown and Hamilton County. Plaintiff alleges that the deputies were negligent in transporting and handcuffing him, their actions were reckless, and plaintiff was injured as a result of their actions. Plaintiff claims that Hamilton County is vicariously liable for McKown's reckless operation of the van and plaintiff's resulting injuries.

Defendants Taylor and McKown argue that they are entitled to summary judgment on plaintiff's negligence claim because Ohio Rev. Code Chapter 2744 grants them absolute immunity from liability. Defendants allege that as employees of a political subdivision who were performing a governmental function, the deputies cannot be held liable for negligent acts or omissions. (Doc. 61 at 31). Defendants further argue that the official capacity claim against Taylor must be

dismissed because she was not driving the van and therefore cannot be held liable for negligent operation of a motor vehicle. *Id.* at 33. They argue the official capacity claim against McKown must be dismissed because the evidence is insufficient to establish that McKown was negligent or that his alleged actions caused plaintiff's injuries. (*Id.*). Rather, defendants argue that plaintiff is responsible for his own injuries because he did not hold on to the strap in the van. (*Id.*).

### i.    Negligence standard and immunity

To establish actionable negligence under Ohio law, the plaintiff must show the existence of a duty, a breach of that duty, and injury proximately resulting from the breach. *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989). Negligence "is the failure to exercise ordinary care so as to avoid injury to others." *Foulke v. Beogher*, 850 N.E.2d 1269, 1273 (Ohio App. 3d Dist. 2006) (citation omitted). "Ordinary care is that degree of care which persons of ordinary care and prudence are accustomed to observe under the same or similar circumstances, and the degree of care required of a motorist is always controlled by and depends upon the place, circumstances, conditions, and surroundings." *Id.*

Political subdivisions in Ohio are shielded from civil liability as provided by the Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744. *See also Culberson v. Doan*, 125 F. Supp.2d 252, 281-82 (S.D. Ohio 2000). Ohio Rev. Code § 2744.02(A)(1) provides broad immunity to political subdivisions from liability "in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." *Id.* A "presumption of qualified immunity is accorded official, governmental acts carried out by political subdivisions and their employees." *Id.* (citing Ohio Rev. Code § 2744.02; *Cook v. City of Cincinnati,* 658 N.E.2d 814, 817 (Ohio App. 1995)). A political subdivision may lose the presumption if its conduct causes an injury that falls under one of the

exceptions listed under Ohio Rev. Code § 2744.02(B)(1)-(5). These exceptions include "[i]njuries caused by the negligent operation of a motor vehicle" and "[i]njuries caused by the negligent performance of proprietary functions." Ohio Rev. Code § 2744.02(B)(1), (2). There is no corresponding exception for injuries caused by the negligent performance of governmental functions, which include police services. *Id.* (citing *Haas v. City of Akron,* 364 N.E.2d 1376, 1377 (Ohio 1977), *overruled on other grounds by Haverlack v. Portage Homes, Inc.,* 442 N.E.2d 749, 752 (Ohio 1982) (holding that police services have always been considered a governmental function, not a proprietary function); Ohio Rev. Code § 2744.01(C)(2)(a).

Thus, a political subdivision retains its immunity from liability for an employee's negligent or reckless acts with respect to government functions except as specifically provided in § 2744.02(B)(1)-(5). *Id.* (citing *Garrett v. City of Sandusky,* 624 N.E.2d 704, 706 (Ohio 1994)). For purposes of the Act, "employee" means "an officer, agent, employee, or servant, whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision." Ohio Rev. Code § 2744.01(B). "Reckless" acts are "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (quoting *Thompson v. McNeill*, 559 N.E.2d 705 (Ohio 1990)).

Under § 2744.03, an employee is immune from liability unless either (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment, or (b) the employee's acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code §§ 2744.03(A)(1) and (6)(b). *Culberson*, 125 F. Supp.2d at 283. The issue of whether a defendant is entitled to immunity is a question of law. *Id.* (citing *Nease v. Medical College Hosps.*, 596 N.E.2d 432, 435 (1992)).

ii.      **Negligence claim against McKown**

Defendants argue that defendant McKown is entitled to immunity from liability and to summary judgment on plaintiff's negligence claim because first, there is no evidence to support a negligence claim, and second, there is no evidence that McKown's conduct was reckless. (Doc. 67 at 13-14). Defendants do not dispute that as the driver of a transport vehicle conveying a handcuffed person in custody, McKown owed a duty of ordinary care to plaintiff. However, defendants argue that "the record evidence fails to establish that the cause in fact and proximate cause of [plaintiff's] injuries were solely due to the driving of Deputy McKown rather than the Plaintiff's own comparative negligence (i.e., being intoxicated, suffering from sleep apnea, his inability or blatant refusal to hold on to the safety strap.)" (*Id.*). Defendants also contend that plaintiff has presented only his "self-serving" testimony in alleging that defendants' actions were reckless and has not cited evidence that provides a complete picture of the incident. (*Id.* at 14).

Plaintiff argues that defendant McKown is not entitled to immunity in his individual capacity because he acted recklessly. (Doc. 63 at 15, citing Ohio Rev. Code § 2744.03(A)(6)(b)). Plaintiff alleges that defendant McKown is equally liable for negligence based on too-tight handcuffs because he did not address plaintiff's complaints about the excessively tight handcuffs, which plaintiff directed to both deputies. (*Id.* at 16).

Contrary to defendants' argument, plaintiff is not required to "establish" that McKown's reckless driving was the sole cause of his injuries to survive summary judgment on his negligence claim against defendant McKown; plaintiff need only produce evidence sufficient to show there is a genuine issue of material fact as to whether McKown breached his duty of ordinary care to plaintiff and whether the breach caused injuries to plaintiff. *See Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). To overcome McKown's immunity claim, plaintiff must produce evidence to show McKown acted recklessly. Plaintiff has met his burden at the summary judgment

stage. Plaintiff has shown there is a genuine issue as to whether McKown took the Fifth Street exit too fast and whether he came to an abrupt stop moments later, which caused plaintiff to be thrown off the bench twice and injured. Further, for the reasons discussed earlier, a trier-of-fact could reasonably infer that McKown's actions were reckless, particularly given evidence in the record that plaintiff was intoxicated, he was seated on a bench in a dark van in handcuffs, and he was not seat-belted during the drive. Disputes about this evidence cannot be resolved at the summary judgment stage. Because plaintiff has produced evidence which, if construed in his favor, shows there is a genuine issue as to whether McKown's conduct was reckless and whether plaintiff suffered injuries as a result, McKown is not entitled to immunity under Ohio law and to summary judgment in his individual capacity.

### iii. Negligence claim against defendant Taylor

Defendants argue that Deputy Taylor is entitled to summary judgment on plaintiff's negligence claim because Ohio law affords her absolute immunity, and the official capacity claim against her must be dismissed because the exception to immunity for negligent operation of a motor vehicle does not apply to her actions. (Doc. 61 at 31-32). Plaintiff alleges that Taylor is not entitled to immunity from liability because her conduct was reckless. (Doc. 63 at 16). Plaintiff alleges that Taylor twice ignored plaintiff's complaints that his handcuffs were too tight, and he was unable to stabilize himself in part because of the too-tight handcuffs.

Plaintiff's deposition testimony and additional evidence, when construed in his favor, support a reasonable inference that by her acts and omissions, defendant Taylor breached a duty of ordinary care that she owed to plaintiff in connection with his transport to the Justice Center and she was reckless. Defendant Taylor is not entitled to immunity from liability on plaintiff's claim under Ohio law.

34

Defendant Taylor also is not entitled to immunity from liability on plaintiff's state law negligence claim under the Federal Volunteer Protection Act (VPA), 42 U.S.C. § 14503. (*See* Doc. 61 at 15-16). Under the Act, unless certain exceptions apply, "no volunteer of a nonprofit organization or governmental entity shall be liable for harm caused by an act or omission of the volunteer on behalf of the organization or entity if--

> (1) the volunteer was acting within the scope of the volunteer's responsibilities in the nonprofit organization or governmental entity at the time of the act or omission;
> (2) if appropriate or required, the volunteer was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the volunteer's responsibilities in the nonprofit organization or governmental entity;
> (3) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer; and
> (4) the harm was not caused by the volunteer operating a motor vehicle, vessel, aircraft, or other vehicle for which the State requires the operator or the owner of the vehicle, craft, or vessel to--
> (A) possess an operator's license; or
> (B) maintain insurance.

42 U.S.C. § 14503(a). The Act defines "volunteer" as "an individual performing services for a nonprofit organization or a governmental entity who does not receive--

> (A) compensation (other than reasonable reimbursement or allowance for expenses actually incurred); or
> (B) any other thing of value in lieu of compensation, in excess of $500 per year, and such term includes a volunteer serving as a director, officer, trustee, or direct service volunteer."

42 U.S.C. § 14505.

Defendant Taylor alleges that she cannot be held liable for plaintiff's injuries because she was performing volunteer work for a political subdivision, Hamilton County, at the time of the incident; she was not driving and she did not put her handcuffs on plaintiff; plaintiff testified that she responded "live with it" when he complained the handcuffs were too tight, but the handcuffs were not the cause of the injuries to plaintiff's elbow and hand; and testimony that McKown took

the Fifth Street exit ramp too fast and came to an abrupt stop are not enough to establish an exception to volunteer immunity under the statute. (Doc. 61 at 15-16).

In response, plaintiff alleges that defendant Taylor was not serving as a "volunteer" as that term is defined under 42 U.S.C. § 14505(6). (Doc. 63 at 12-13). Plaintiff argues that Taylor received a thing of value in excess of $500 per year in exchange for providing eight hours of service each month to the HCSD; i.e., she qualified to work paid details for private entities at a rate of $34.00 per hour. (*Id*. at 13, citing Doc. 37 at PAGEID#: 105). Plaintiff further contends that even if she is considered a volunteer under the Act, she is not entitled to immunity under the exception set forth in § 14503(g)(1)(D) because her conduct violated plaintiff's Fourth Amendment rights. *Id*. at 13-14 (citing *Gelinas v. Boisselle*, No. CIV.A. 10-30192-KPN, 2011 WL 5041497, at *8 (D. Mass. Oct. 17, 2011) (the court denied immunity to a volunteer school board member under the VPA for a potential First Amendment violation)).

In reply, Taylor argues that the statute is intended to exclude from the definition of "volunteer" individuals who are not paid by the organization for which they volunteer, which in this case would be the HCSD. Because Taylor was not paid by the HCSD, she argues she cannot be held liable because she is immune under the VPA. (Doc. 67 at 16, citing Doc. 37 at PAGEID#: 95).

Lieutenant Donald Robinson gave deposition testimony regarding the HCSDS in his capacity as treasurer for the HCSDS. (Doc. 42 at PAGEID#: 718). Robinson testified that in order to work an off-duty detail, a Hamilton County Special Deputy must work eight hours per month for the HCSO without pay. (*Id*. at PAGEID#: 725-26, 742). Robinson testified that he worked for the HCSDS but was paid by the vendors he did the off-duty details for. (Doc. 42 at PAGEID#: 717). He testified that the purpose of the HCSDS is to assist the HCSO in a law enforcement capacity as needed. (*Id*. at PAGEID#: 722). Special Deputies are considered

members of the HCSDS, and they enter into agreements with the HCSO. (*Id.* at PAGEID#: 722-723). All requests for off-duty services go through the HCSO, and a full-time officer serves as the liaison between the HCSDS and the HCSO. (*Id.* at PAGEID#: 726, 740-41). Special Deputies can work "required county time" details and off-duty details. (*Id.* at PAGEID#: 725). The HCSO requires the HCSDS to provide prisoner transport on Fridays and Saturday evenings from approximately 7:00 p.m. to 1:00 a.m. (*Id.* at PAGEID#: 731). The pay rate for off-duty details is set by the Hamilton County Sheriff, is nonnegotiable, and currently is $34.00 an hour. (*Id.* at PAGEID#: 744). Most Special Deputies participate in the program so that they can work the off-duty details. (*Id.* at PAGEID#: 746). There are "a handful" of Special Deputies who do not work paid details. (*Id.* at PAGEID#: 742). The training requirements are mandated by the State of Ohio and are the same as the requirements for full-time deputies. (*Id.* at PAGEID#: 747). The HCSO mandates that Special Deputies carry the same equipment as full-time deputies but it does not provide the equipment. (*Id.* at PAGEID#: 748).

The value of the off-duty details Taylor was assigned through the HCSO in 2015 exceeded $500, and her total compensation for the year was $5,000. (Doc. 62-1 at PAGEID#: 1378, Taylor's Response to Plaintiff's Second Set of Interrogatories, No. 16).

Defendant Taylor is not entitled to immunity from liability for negligence under the VPA. First, plaintiff satisfies the definition of "an individual performing services for a . . . governmental entity" who receives a "thing of value in lieu of compensation, in excess of $500 per year." 42 U.S.C. § 14505(B). The "thing of value" she received was the opportunity to work private duty details assigned by the HCSO at a rate of $34.00 an hour for which she would not otherwise be eligible if she did not perform mandatory service for the HCSO. The prison transport work detail Taylor was working the night plaintiff was injured was part of the mandatory service she performed in order to be assigned paid details.

37

Taylor argues that the Act "clearly intends to exclude from coverage" individuals who are not paid by the organization for which they volunteer, which in this case would be the HCSO. (Doc. 67 at 16). However, defendant has not cited any authority to support this argument. In any event, the "thing of value" she received in lieu of compensation for her service to the HCSO was provided by the HCSO: i.e., the opportunity to work private duty details for compensation. This opportunity was provided by the HCSO to members of the HCSDS who fulfilled the program requirements established by the HCSO, including the minimum monthly unpaid service hours requirement. Thus, Taylor received something of value in lieu of compensation in excess of $500 per year for unpaid service to the HCSO. Defendant has not shown she was serving as a "volunteer" as that term is defined under § 14505 when transporting plaintiff. Further, because a reasonable jury could find that her conduct was reckless and a proximate cause of plaintiff's injuries, the exception to immunity set forth in § 14503(a)(3) potentially applies. Thus, defendant Taylor is not entitled to summary judgment on the ground she is immune from liability under the VPA.

### iv. Vicarious liability of defendant Hamilton County, Ohio

Plaintiff alleges that Hamilton County does not have immunity from liability for McKown's actions under Ohio Rev. Code § 2744.02(B) because evidence in the record supports a finding that McKown drove the van in a negligent manner and caused injury to plaintiff. (*Id.* at 14). The Court agrees. Because there are disputed questions of fact as to whether McKown breached a duty of care to plaintiff by operating the van in a negligent and reckless manner and caused injury to plaintiff, defendant Hamilton County is not entitled to immunity from liability for defendant McKown's actions. *See* Ohio Rev. Code § 2744.02(B)(1) ("Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by

the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority.").

## IT IS THEREFORE ORDERED THAT:

1)      Defendants' motion for summary judgment is **GRANTED** on (1) plaintiff's § 1983 claim against defendant Special Deputy Joanne Taylor; (2) plaintiff's § 1983 claims against the Hamilton County, Ohio Board of County Commissioners and Hamilton County, Ohio and the Hamilton County Special Deputy Sheriffs, Inc.; and (3) plaintiff's § 1983 claim for excessively forceful handcuffing against defendant Special Deputy Patrick McKown.

2)      Defendants' motion for summary judgment is **DENIED** as to plaintiff's § 1983 claim for reckless driving against defendant McKown; and (2) plaintiff's state law negligence claims against defendants Taylor and McKown and against defendant Hamilton County, Ohio under a theory of vicarious liability.

3)      Defendant Hamilton County Special Deputy Sheriffs, Inc. is **DISMISSED** from the lawsuit.

Date: _1/7/19_

Karen L. Litkovitz
United States Magistrate Judge